**INTERNATIONAL LEATHER DISTRIB-UTORS, INC., Plaintiff,**

v.

**The CHASE MANHATTAN BANK, N. A., Defendant.**

**No. 74 Civ. 2436 (HFW).**

United States District Court,
S. D. New York.

Jan. 24, 1979.

Gifford, Woody, Carter & Hays, New York City by James P. Beggans, Sheila M. Kahoe, New York City, of counsel, for plaintiff.

Milbank, Tweed, Hadley & McCloy, New York City by Andrew J. Connick, Lana Borsook, New York City, of counsel, for defendant.

## MEMORANDUM AND ORDER

WERKER, District Judge.

This diversity action was commenced by plaintiff International Leather Distributors, Inc. ("International Leather") against the defendant Chase Manhattan Bank, N. A. ("Chase") and arises from an allegedly improper payment on a letter of credit. This suit having been tried on the merits before the Court on November 1, 1978, and all the evidence having been duly considered, judgment is rendered for the defendant. Pursuant to Fed.R.Civ.P. 52(a), my findings of fact and conclusions of law are as follows:

### FINDINGS OF FACT

International Leather is a New Jersey corporation engaged in the business of importing, processing and selling leather, while Chase is a national banking association with its principal place of business in New York. Pretrial Order, Agreed Findings ¶¶ 1, 3.

In 1972, International Leather entered into a business arrangement with two Argentine companies, Meiners International, S. A. ("Meiners") and Provisa, S. A. ("Provisa"), pursuant to which Meiners was to procure and tan leather hides and Provisa was to export them to International Leather in the United States. Tr. at 15–16; Pretrial Order, Agreed Findings ¶ 6.

In June 1972, International Leather opened a checking account with Chase at its main branch in New York City. Provisa utilized the Banco Argentina de Comercio ("BAC") in Buenos Aires as its bank. Pretrial Order, Agreed Findings ¶¶ 5, 7.

In November 1972, in order to provide Provisa and/or Meiners with financing to continue their operations, International Leather obtained a line of credit from U.S. Industries, Inc. ("U.S. Industries"), one of its major customers in the United States. This line of credit took the form of two

letters of credit issued by Bankers Trust Company, U.S. Industries' bank, to the benefit of Chase. One of the letters of credit was in the amount of $1,000,000 and expired May 15, 1973 and the other letter of credit was in the amount of $500,000 and expired November 15, 1973. International Leather used part of this line of credit to borrow $800,000 cash from Chase in separate transactions of $500,000 and $300,000, which amounts were advanced to Provisa with Chase's knowledge. The remainder of the line of credit was used on November 20, 1972 to open a $700,000 letter of credit to the benefit of BAC. This letter of credit (the "BAC credit") was intended to induce BAC to extend credit to Provisa and/or Meiners and expired on May 1, 1973. Tr. at 22–23; Pretrial Order, Agreed Findings ¶¶ 11–15, 18.

The BAC credit, as amended on November 27, 1972, contained the following documentary requirements:

YOUR DRAFTS AT sight for full invoice value ACCOMPANIED BY YOUR SIGNED STATEMENT THAT PROVISA SAICIFIA AND/OR MEINERS INTERNATIONAL SAICFIA HAS FAILED TO REPAY U.S. DOLLAR AND/OR ARGENTINE PESO AMOUNT DUE BANCO ARGENTINA DE COMERCIO BUENOS AIRES, ARGENTINA ON EXPIRATION DATE OF CREDIT FACILETY PHOTOCOPY OF CREDIT FACILITY DOCUMENTATION

Joint Trial Exhs. 3, 5.[1] The amendment was made by Chase with International Leather's approval. Pretrial Order, Agreed Findings ¶ 22. Joseph Ruccio, the president of International Leather,[2] reviewed the BAC credit as well as the amendment thereto and understood what the documentary requirements were. Tr. at 23–25; see also Joint Trial Exhs. 5, 6.

In March 1973, Ruccio and a Mr. Evans, who was then associated with Meiners and

---

1. The quoted portion of the BAC credit has been reproduced *in haec verba.*

2. Ruccio graduated from Seton Hall College in 1954 with a bachelor's degree in management science. He has been in the business of importing, processing and selling leather since 1956. Tr. at 13.

who has since passed away, met at Chase's offices in New York with William Timmerman, the Chase lending officer handling the International Leather account.[3] At this meeting, Evans informed Timmerman that because of the problems and general situation in Argentina, BAC "was getting nervous about everything." Although Evans and Ruccio represented to Timmerman that these general problems did not concern Provisa, Evans raised the possibility of BAC drawing under the BAC credit. Neither Evans nor Ruccio cited any reasons specifically involving Provisa for this belief. Evans asked Chase to finance International Leather instead of drawing on the Bankers Trust letters of credit in the event BAC did draw on the BAC credit. Chase agreed to do so, and asked Ruccio to execute on behalf of International Leather an undated promissory note in the amount of $700,000 which would be used in the event of a BAC drawing. Ruccio agreed to and did sign the promissory note, which was received in evidence as Joint Trial Exh. 8. Tr. 60–62, 68–69.

On April 26, 1973, BAC sent a telex to Chase which by its terms was to be considered dated February 26, 1973. The telex was received by Chase on April 27, 1973 and stated that it was to be considered a draft for $700,000 under the BAC credit. The telex also stated that it was BAC's signed statement that Provisa had failed to repay amounts due BAC on the expiration date of credit facilities that included peso loans equal to $750,000. In addition, the telex alleged that Provisa had failed to properly liquidate export operations in excess of $2,200,000 and that BAC consequently was entitled to draw the full amount of the BAC credit. The telex concluded by stating

that confirmation of the telex, photocopies of all documentation supporting the credit facilities granted and cancelled, and a properly signed draft were being airmailed. Pretrial Order, Agreed Findings ¶¶ 23, 24; Joint Trial Exh. 7.

On April 27, 1973, after Chase received the BAC telex, Timmerman telephoned Ruccio and read him the entire text of the telex.[4] Pretrial Order, Agreed Findings ¶ 25; Tr. at 62–63. Ruccio knew at that time that the required documents had not yet been received by Chase. Tr. at 4, 63. See Joint Trial Exh. 7. Ruccio then authorized Chase to pay BAC under the BAC credit and to make the loan to International Leather to cover that payment as they had previously agreed. Tr. at 4, 63. On April 27, 1973, or shortly thereafter, the $700,000 demand note that Ruccio had executed at the March 1973 meeting and that had been left undated was apparently dated April 27, 1973.[5] In addition, Ruccio also executed a $300,000 demand note to cover the $300,000 note due May 1, 1973 that had been executed when International Leather borrowed the $800,000 cash from Chase to lend to Provisa. Tr. at 7–8, 61–62; see Pretrial Order, Agreed Findings ¶ 28. At approximately the same time, Ruccio received a copy of the April 26, 1973 telex, which he placed into his files. He did not consult Argentine counsel with respect to Provisa's indebtedness to BAC. Tr. at 32–33.

On April 30, 1978, Chase sent to International Leather a confirmation of its payment to BAC under the BAC credit. The confirmation, which Ruccio received and read, contained the typed-in notation: "CABLE PAYMENT[.] UPON RECEIPT OF THE RELATIVE DOCUMENTS WE

---

3. Timmerman testified to this effect at trial. Tr. at 60–62. Ruccio, however, testified that he did not recall a meeting with Timmerman and Evans in March 1973. Tr. at 24. The Court finds Timmerman's testimony to be more credible.

4. Timmerman and Ruccio gave conflicting testimony on this point as well. Ruccio testified that Timmerman read him the "bottom half of the telex," Tr. at 4, while Timmerman testified that he read the entire telex to him. Tr. at

62–63. The Court finds Timmerman's testimony to be more credible.

5. See Joint Trial Exh. 8, which is dated April 27, 1973. See also Tr. at 61–62. Ruccio's testimony on the issue of the promissory note was somewhat vague. He recalled signing demand notes, but thought that he did not do so until after the BAC credit had been called. Tr. at 24–25.

SHALL BE PLEASED TO REVERT TO THIS TRANSACTION." Joint Trial Exh. 9. Ruccio thus knew that the required documentation still had not been received at that time. Tr. at 5, 27.

The documents still had not arrived by May of 1973. At that point, Ruccio began telephoning Timmerman repeatedly to inquire about the documents. Timmerman informed him on several occasions that Chase had contacted BAC requesting them to forward the requisite documents. Tr. at 5–6, 65–66.

On May 18, 1973, Chase called the $700,000 and $300,000 demand notes and demanded immediate payment. International Leather made payment in full by July 16, 1973. Pretrial Order, Agreed Findings ¶ 29.

Chase finally received some documents from BAC in August 1973. These consisted of a confirmation of the April 1973 telex and a signed sight draft for $700,000 dated February 26, 1973. In October 1973, Chase received in addition a second signed sight draft for $700,000, also dated February 26, 1973, a bank statement relating to Provisa's current account at BAC, and two telegrams. Id. ¶¶ 30, 31; Joint Trial Exhs. 10, 11, 12A–12D; Tr. at 64. International Leather did not receive any of these documents until after this action had been commenced. Pretrial Order, Agreed Finding ¶ 27.

The bank statement received by Chase in October 1973 related to Provisa's current account, which was essentially a checking account. Provisa also had throughout the first half of 1973 two loan accounts at BAC. The combined balance of the two loan accounts on April 26, 1973 was a debit balance of 7,543,030.73 pesos, equivalent to approximately $750,000. Tr. at 82–88; Joint Trial Exh. 13A. That day, BAC transferred this debit balance to Provisa's current account, leaving the current account overdrawn 7,572,298.26 pesos, or approximately $750,000, and directed Provisa to make payment within 24 hours to cover the overdraft. Tr. at 88–89; Joint Trial Exh. 13E.

The amount of the debit balance transferred to Provisa's current account represented obligations Provisa owed to BAC that had been accelerated pursuant to the terms of the loan application form, which provided *inter alia* :

[If BAC] should obtain notice of [Provisa] being placed under judicial restraint or injunction or of any other circumstance which will impair the good reputation and personal and commercial solvency attributed to [Provisa] upon the granting of the loan and the carrying out of this operation, . . . without further proceedings, [Provisa's] obligations may also be considered due and payable and their immediate payment demanded.

Joint Trial Exh. 13B. The loans which Provisa had outstanding prior to the acceleration were demand loans to be used in conjunction with Provisa's current account. Tr. at 95–96.

BAC knew as early as February 1973 that Provisa was in violation of certain Argentine control regulations regarding the negotiation of foreign currency. At that time BAC sent the first of at least two reports to the Argentine Central Bank advising it of Provisa's noncompliance with exchange regulations. Joint Trial Exh. 13C. A second such report was sent to the Central Bank in June or July of 1973. Joint Trial Exh. 13D.

BAC did not receive any payments from Provisa of any of its indebtedness subsequent to April 26, 1973. After BAC received the proceeds of the BAC credit, there remained a debit balance in Provisa's account with BAC of some $30,000. Tr. at 90–91.

In October 1973, BAC filed a petition of bankruptcy against Provisa in Argentina. Pretrial Order, Agreed Findings ¶ 33; Tr. at 91.

In June 1974, International Leather commenced the instant action against Chase seeking compensatory and punitive damages. The complaint, as amended, alleges the following causes of action: (1) Chase improperly paid BAC since the terms of the BAC credit were not met; (2) Chase's representation that the requisite documents were forthcoming was fraudulent; (3) the plaintiff was forced to incur expenses to obtain new credit facilities as a result of

Chase's actions; (4) the plaintiff's credit standing was tortiously diminished as a result of Chase's actions; (5) Chase or BAC failed to take advantage of the protection of a prenda [6] that had been filed as a security interest to protect the loans BAC made to Provisa; and (6) Chase intentionally failed to supply plaintiff with the requisite documents, thereby preventing the plaintiff from perfecting its preferred creditor status prior to the declaration of Provisa's bankruptcy. Counts five and six were dismissed on the record after trial on the grounds that there was no evidence in the record that would sustain either of those two causes of action. Tr. at 107.

## DISCUSSION

The BAC credit [7] expressly set forth three documentary requirements that

6. A "prenda" is a floating lien or security interest recognized under Argentine law. Pretrial Order, Agreed Findings ¶ 34.

7. Pursuant to its express terms and U.C.C. § 5–102(4), the BAC credit is governed by the Uniform Customs and Practice for Documentary Credits (1962 revision), International Chamber of Commerce Brochure No. 222 (the "UCP").

8. It is clear that none of the three documents required by the BAC credit had been received by Chase on April 27, 1973. Despite the language in the telex that it was to be considered a draft and a signed statement, Chase did not consider the telex to be an adequate substitute for the actual documents. Moreover, the required photocopy of the relevant credit facility certainly did not accompany the telex.

9. At least two contracts are present in an irrevocable documentary letter of credit situation: a contract between the issuing bank (Chase) and the beneficiary (BAC) of the letter of credit, and a contract between the issuing bank and its customer (International Leather) who opened the letter of credit. *See Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 886 (3d Cir. 1977); *Venizelos, S. A. v. Chase Manhattan Bank*, 425 F.2d 461, 464–65 (2d Cir. 1970). The issuing bank is obligated to pay the beneficiary if the latter meets the terms of the letter of credit, and if the issuing bank pays the beneficiary in the absence of strict compliance it breaches its contract with its customer. *Chase Manhattan Bank v. Equibank*, 550 F.2d at 886; *Courtaulds North America, Inc. v. North Carolina National Bank*, 528 F.2d 802, 805–06 (4th Cir. 1975); *Venizelos, S. A. v. Chase Manhat-*

had to be met before BAC could draw under it. These were a sight draft, a signed statement that Provisa and/or Meiners had defaulted on obligations to BAC, and a photocopy of the relevant credit facility. On April 27, 1973, these requirements had not been met,[8] nor were they fulfilled by May 1, 1973, the date the BAC credit expired. Since the terms of the BAC credit were not strictly complied with, Chase's $700,000 payment to BAC violated International Leather's rights under its contract with Chase,[9] unless it is found that International Leather waived presentation of the documents.[10] I find that it did.

A waiver is an intentional and voluntary abandonment or relinquishment of a known right or privilege. *City of New York v. State*, 40 N.Y.2d 659, 389 N.Y.S.2d

*tan Bank*, 425 F.2d at 465; *See* UCP General Provision (b). In the instant action, it is clear that BAC did not strictly comply with the terms of the BAC credit. *See* footnote 8 *supra.*

Because Chase was obligated in the instant situation to pay BAC in the event of a default by Provisa, it may appear at first glance that Chase's obligation was a guaranty and as such *ultra vires* since Chase is a national bank. *Barclays Bank D. C. O. v. Mercantile National Bank*, 481 F.2d 1224, 1235–36 (5th Cir. 1973), *cert. denied*, 414 U.S. 1139, 94 S.Ct. 88 (1974). This was not the actual case, however, for Chase's obligation herein was that of an issuing bank, whose obligation under a letter of credit is primary whereas the obligation of a guarantor is merely secondary. *Bank of North Carolina, N. A. v. Rock Island Bank*, 570 F.2d 202, 206 & n.7 (7th Cir. 1978); *Barclays Bank D. C. O. v. Mercantile National Bank*, 481 F.2d at 1236 & n.18. In a documentary letter of credit situation, the issuing bank is concerned only with documents and whether the requisite documents have been properly presented. The issuing bank is not concerned with the underlying transaction between the customer and the beneficiary. UCP arts. 7–8; *Bank of North Carolina, N. A. v. Rock Island Bank*, 570 F.2d at 206 n.7.

10. In its pretrial papers, Chase also raised the defense that the custom and practice of the banking industry is to release funds under a performance letter of credit prior to the receipt of required documents. The only evidence adduced at trial on this point, however, was to the contrary. Tr. at 45–47, 55–56. Thus the only defense by which Chase can prevail is the issue of waiver.

332, 357 N.E.2d 988 (1976). It may be formally expressed or it may be implied from words or acts from which intent to waive can be reasonably and clearly inferred. *Zuber v. Commodore Pharmacy, Inc.,* 24 A.D.2d 649, 262 N.Y.S.2d 155 (2d Dep't 1965); *Cicero Industrial Development Corp. v. Roberts,* 63 Misc.2d 565, 312 N.Y.S.2d 893 (Sup.Ct. Onondaga Co. 1970).

Ruccio clearly had knowledge of International Leather's right to the documents under the BAC credit. Tr. at 23–25. With a degree in management science and, at that time, some seventeen years experience in the leather business, Ruccio was certainly sufficiently knowledgeable and sophisticated to understand the documentary requirements set forth in the BAC credit. Moreover, it is the Court's conclusion, based on the evidence adduced at trial, that Ruccio knew of Provisa's financial problems well before he was informed of the April 1973 telex. It is the Court's finding that Ruccio and Evans called the March 1973 meeting because they specifically knew that Provisa had not been repatriating funds and that Provisa was therefore not in compliance with exchange regulations, despite their contentions otherwise at that meeting. Ruccio and Evans knew, therefore, at least as early as March 1973, that Provisa would not be able to meet its obligations to BAC.[11] At the March 1973 meeting, they were attempting to buy time for International Leather against the draw on the BAC cred-

it, which they believed to be inevitable,[12] and for that reason induced Chase to accept the undated promissory note in place of a demand on the Bankers Trust letter of credit.

This reasoning explains Ruccio's resignation to authorize Chase to pay BAC and to make effective the $700,000 note (which had been previously executed by Ruccio) when informed of the April 1973 telex. The telex, along with Ruccio's prior knowledge of Provisa's difficulties, furnished sufficient information for Ruccio to believe that Provisa had indeed defaulted.[13] The documentary requirements, although necessary under the BAC credit, were nevertheless simply corroborative of Provisa's default.

Thus, when Ruccio on behalf of International Leather authorized Chase to make payment under the BAC credit in April 1973, he did so intentionally and voluntarily with the knowledge that the requisite documents had not been received. Moreover, Ruccio did not withdraw this authorization or otherwise object when he received the confirmation of payment to BAC, which clearly indicated that the documents still had not been received. In my opinion, Ruccio's agreement to pay without receiving the documents and his failure to demand those documents in writing after he received a copy of the telex operated as an intentional and voluntary relinquishment of a known right. Chase has clearly and deci-

---

11. The Court notes that Provisa was in violation of the exchange regulations at least as early as January 1973, *see* Joint Trial exh. 13C, and the April 1973 telex apparently was prepared originally in February 1973, all of which provides additional support for the inference that Evans and Ruccio attended the March meeting with some knowledge that BAC was going to demand payment under the BAC credit.

12. By persuading Chase to provide additional financing rather than drawing on the Bankers Trust letters of credit, it is clear International Leather was seeking to delay being required to make payment. At trial, Ruccio testified on direct examination, with respect to the demand notes executed on behalf of International Leather in Chase's favor, that "money would not be available to me until November [1973] . . . .." Tr. at 8.

13. There can be no doubt that Provisa was in fact in default on April 26, 1973. International Leather did not present any evidence at trial to refute this conclusion, and relied solely on cross-examination and oral argument to support its contention that Provisa was not in default. The Court finds, however, on the basis of the evidence presented by Chase that Provisa was in default and that BAC properly accelerated the obligations Provisa owed BAC. The fact that Provisa was in violation of exchange regulations certainly impaired its "good reputation and personal and commercial solvency." Joint Trial Exh. 13B. By the very terms of the loan application, then, BAC was able to consider the obligations due and payable and to demand immediate payment "without further proceedings." *Id.*

sively shown that International Leather waived presentation of the requisite documents. I find, therefore, that Chase's payment under the BAC credit was proper. Accordingly, count one of the complaint must be dismissed. Counts two, three and four are predicated on findings that the documentary requirements were not waived and that Chase's payment was improper. Since I have found otherwise, counts two, three and four must also be dismissed.

## CONCLUSION

For the foregoing reasons, the complaint is dismissed in its entirety and judgment is granted for the defendant. Chase is directed to submit a judgment within 10 days after entry of this memorandum and order.

SO ORDERED.