In re SANDERS–LANGSAM TOBACCO
CO., INC., et al., Debtor.

SANDERS–LANGSAM TOBACCO
CO., INC., et al., Plaintiff,

v.

CHEMICAL BANK, Defendant.

Bankruptcy Nos. 094–72683–511, 094–
72684–511 and 095–70358–511.
Adversary No. 095–7075–511.

United States Bankruptcy Court,
E.D. New York.

Aug. 13, 1998.

**2**

Finkel, Goldstein, Berzow & Rosenbloom by Kevin Nash, New York City, for Official Committee of Unsecured Creditor.

Chemical Bank Legal Department by Andrew N. Keen, New York City, for Defendant.

## DECISION

MELANIE L. CYGANOWSKI, Bankruptcy Judge.

### *(Motion for Summary Judgment and Cross–Motion for Partial Summary Judgment)*

By its motion, defendant Chemical Bank ("Chemical") seeks summary judgment dismissing, with prejudice, the complaint of plaintiff, Sanders–Langsam Tobacco Co., Inc. (the "Debtor") in its entirety. The Official Committee of Unsecured Creditors (the "Committee"), as assignee of the Debtor, opposes the relief requested and cross-moves

for partial summary judgment on the first claim for relief contained in the complaint. Having fully considered the papers presented and the arguments of counsel, the Court agrees that the material facts relevant to the issues at hand are not in dispute and that the issues are ripe for determination by summary judgment.

This decision constitutes the Court's findings of fact and conclusions of law to the extent that the same are required by Fed. R. Bankr.P. 7052(b).

## FACTUAL BACKGROUND

### 1. Overview

The center of the pending controversy concerns the alleged wrongful dishonor by Chemical of two irrevocable letters of credit totaling $300,000. Although certain facts are claimed to be in dispute, a thorough review of the record before the Court amply demonstrates that it is not the *facts* that are challenged, but the *application of the facts* that sparks debate. With this in mind, the Court turns to the facts of the case.

In June 1990, the Debtor entered into a Purchase/Supply Agreement (the "Agreement") with Long Island Consortium, Inc. ("LIC"), as purchasing agent for Sinew Corporation ("Sinew"). LIC[1] and Sinew[2] together operated various general merchandising stores under the trade name "Cheap John's" and will, for convenience, be referred to herein collectively as simply "Cheap John's." The Agreement provided that the Debtor was to supply Cheap John's with all of its cigarette, candy and tobacco needs. In turn, the Agreement required Cheap John's to secure payment of the merchandise by obtaining a $300,000 letter of credit in favor of the Debtor.

In accordance with the Agreement, Sinew obtained two irrevocable letters of credit from Chemical for the benefit of the Debtor.

Both letters of credit were issued by Chemical on June 15, 1992 and included the following: (1) a letter of credit, number L–290078, in the amount of $285,000 (the "First LOC"); and (2) a letter of credit, number L–290077, in the amount of $15,000 (the "Second LOC"). Both letters of credit had expiration dates as well as certain documentation conditions that had to be satisfied prior to release of the funds (the "Documentary Conditions"). In addition, both letters of credit provided that they would be "subject to the Uniform Customs and Practice for Documentary Credits (1983 Revision) International Chamber of Commerce Publication No. 400" (the "UCP").

The First LOC originally had an expiry date of December 15, 1992, and contained the following Documentary Conditions:

a) Beneficiary's signed statement stating that Sinew has failed to comply with the terms and conditions of a contract described as failure to pay within terms of the invoice; and

b) Copy of the Applicant's signed statement certifying that there is no current dispute at this time.

*See* Affidavit of Anthony A. Capasso in Support of Chemical Bank's Motion for Summary Judgment, sworn to on August 31, 1995 (the "First Capasso Aff."), Exh. A.

The First LOC was subsequently amended numerous times. It was first amended on or about June 30, 1992, fifteen days after it was originally issued, by Sinew to reflect a change in the Documentary Conditions. As amended, the Documentary Conditions for the First LOC read as follows:

a) Beneficiary signed statement that the Applicant of the credit has failed to comply with the terms and conditions of a contract described as failure to pay within terms of the invoice;

---

1. On January 24, 1995, LIC filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the Eastern District of New York, Westbury Division. The case bears case number 095–80422–478 and is assigned to the Honorable Dorothy T. Eisenberg. Slightly more than one year later, the Chapter 11 case was converted to Chapter 7 on February 5, 1996.

2. On January 24, 1995, Sinew filed a voluntary petition for relief under Chapter 11 and was also assigned to Judge Eisenberg. The case bears case number 095–80421–478. Subsequent to its filing, the Chapter 11 case was converted to Chapter 7 on December 28, 1995.

b) Full set of invoices detailing amounts due;

c) Signed bill of lading evidencing in full of all merchanidse [sic] described in above invoices; and

d) Purchase order evidencing quantities and prices of merchandise in above invoices.

*See* First Capasso Affidavit, Exh. B. Although the First LOC was amended several more times, the amendments dealt exclusively with the expiry date and not with any of the Documentary Conditions. The final expiry date for the First LOC was April 30, 1995. It is undisputed that there were no other requests to amend the First LOC's Documentary Conditions.

The Second LOC also had an original expiry date of December 15, 1992, and contained the following Documentary Conditions:

a) Beneficiary's signed statement stating that Sinew has failed to comply with the terms and conditions of a contract described as failure to pay within terms of the invoice; and

b) Copy of the Applicant's signed statement certifying that there is no current dispute at this time.

*See* First Capasso Aff., Exh. D. This Second LOC was also amended several times. The amendments only concerned the expiry date, however, and none of the Documentary Conditions. The final expiry date for the Second LOC was April 30, 1995. It is undisputed that there were no requests to amend the Second LOC's Documentary Conditions.

Apparently, in the latter part of 1994, Cheap John's became delinquent with respect to its obligations under the Agreement. It is undisputed that Chemical was notified in November 1994 that two law firms had se-

cured liens on the proceeds of the two letters of credit. These two law firms were: (a) Eaton & Van Winkle, possessing a lien on the proceeds of the letters of credit in the amount of $150,000; and (b) Pryor, Cashman, Sherman & Flynn, possessing a lien on the proceeds in the amount of $135,000.

In December 1994, the Debtor made its first attempt to draw upon the two letters of credit.[3] Pursuant to a letter by Debtor's then president, Scott Redding Mixer ("Mixer"), demand was made for the full $300,000 and the documents purporting to be in conformity with the credits' instructions were supplied to Chemical. *See* First Capasso Aff., Exh. G. Included within Mixer's letter is the statement that Debtor was submitting the "purchase order evidencing quantities and prices of merchandise in the above invoices" pursuant to the First LOC's amended Documentary Conditions. Chemical alleges, and the Committee apparently concedes,[4] that such a document was not enclosed with the Mixer letter. The Debtor subsequently withdrew its submission, and the drawing documents were returned to Eaton & Van Winkle.

Thereafter, Eaton & Van Winkle submitted new documents including a new letter from Debtor, dated December 16, 1994, as well as Eaton & Van Winkle's own letter attempting to supplement the first presentation. The revised presentation deleted the statement that the Debtor was submitting the "purchase order evidencing quantities and prices of merchandise in the above invoices" and, in its place, stated the following:

We have delivered a copy of the open purchase order agreement with the Applicant relating to the respective invoices and an affidavit of an officer of the Beneficiary setting forth the procedures used to fill

---

**3.** The Committee alleges that written demand under the First LOC was made on December 2, 1994 pursuant to a letter from Scott Redding Mixer, Debtor's then president. Chemical alleges, however, that the first attempt to draw upon the First LOC was on December 14, 1994, and that this attempt was made through Eaton & Van Winkle. The Committee concedes that the demand was supplemented by further submissions made by Eaton & Van Winkle. This discrepancy does not create an issue of fact that precludes *summary judgment.*

**4.** In the Committee's Consolidated Opposition to Chemical Bank's Motion for Summary Judgment and Application in Support of Plaintiff's Cross–Motion for Summary Judgment (the "Consolidated Opposition"), it acknowledges that the submission was withdrawn without prejudice on December 21, 1994 due to Chemical's "statement regarding certain deficiencies." *Id.* at 6.

such open purchase order, and such open purchase order together with the invoices, evidencing the quantities and prices of merchandise delivered pursuant to the open purchase order.

*See* First Capasso Aff., Exh. G. The open purchase order agreement (*i.e.,* the "Purchase/Supply Agreement," dated June 18, 1990), and the affidavit of Debtor's officer (vice president Steven D. Levine) were reviewed by Chemical's letter of credit department and found to be non-conforming with the First LOC's Documentary Condition requiring a "purchase order evidencing quantities and prices of merchandise in the above invoices." Among other things, Chemical relies upon Levine's affidavit for confirmation that no such purchase orders existed.[5]

On December 19, 1994, Eaton & Van Winkle was advised of this discrepancy. On the following day, Eaton & Van Winkle made yet another submission, this time including a July 16, 1992 letter from Sinew to Debtor which stated the following:

> With regard to the stipulation set forth by our L/C L290778 [sic] Dated June 30, 1992, the following procedures are to be applied:
>
> I. All cigarette orders generated by our computer transmitted electronically to Sanders & Langsam computer will serve as authorized purchase orders. This letter is an authorized document to be used in conjunction with our cigarette orders, and does not require any further signature.
>
> II. All candy for Sinew Corp. received by Sanders & Langsam from the stores are authorized purchase orders, providing these orders do not exceed an aggregate total of Fifteen Thousand (15,000) dollars. This letter is an authorized document to be used in conjunction with our candy order, and does not require any further signature.

This letter, along with the other documents, were submitted in an attempt to comply with the First LOC's requirement that a purchase order be presented, or in the alternative, to evidence a waiver of this requirement. Once again, the presentment was reviewed by Chemical's letter of credit department and found not to meet the requirements of the First LOC because the document submitted was not titled a "purchase order" and did not set forth quantities or prices. Once again, Eaton & Van Winkle withdrew their request and the documents were returned.

Thereafter, in a continuing attempt to comply with the First LOC's fourth requirement, the Debtor, through Eaton & Van Winkle, submitted a further presentment on January 4, 1995. This time, Eaton & Van Winkle included what was referred to as "the original signed purchase order dated July 16, 1992" and an amendment, dated April 15, 1994, which allegedly specified "quantities and prices for the invoices ...." *See* First Capasso Aff., Exh. M. As before, however, Chemical rejected the presentment, informing Debtor that the "April 15, 1994 amendment," the only new document presented, (a) was in fact titled "Service Agreement for Cheap Johns/Wise Buys", (b) was not a purchase order, and (c) did not set forth quantities and prices of merchandise relating to the invoices.

In response to the rejection, Eaton & Van Winkle disagreed that the requirements of the First LOC had not been satisfied. Eaton & Van Winkle asserted that "the invoice, confirmation and agreement (in writing) collectively constitute[d] a 'purchase order evidencing quantities and prices of merchandise in ... invoices'" (*see* First Capasso Aff., Exh. P) and therefore that it was entitled to draw under the First LOC. In reply, Chemical stood by its original position, once again informing Eaton & Van Winkle that their presentment was non-complying. At Eaton & Van Winkle's request, the submitted documents were returned by Chemical. It is undisputed that no further presentments were made, either by the Debtor or Eaton & Van Winkle, under the First LOC.

---

5. The Committee, in its Counter–Statement pursuant to Local Rule 22(b) (presently E.D.N.Y. LBR 7056–1), attempts to dispute Chemical's assertion. However, in Levine's affidavit, he clearly states that "[w]ritten purchase orders do not exist except that the invoices evidence sales, and the attached receipted bills of lading acknowledge delivery of the items on the invoices." *See* First Capasso Aff., Exh. I, at 4, ¶ 16.

Eaton & Van Winkle, on behalf of the Debtor, also sought to draw under the Second LOC. In an attempt to satisfy the requirements of the Second LOC, the Debtor, by letter dated December 16, 1994, certified that "[t]he applicant of the credit has failed to comply with the terms and conditions of a contract described as a failure to pay within the terms of the invoices." *See* First Capasso Aff., Exh. S. However, the letter stated nothing further, and it was not accompanied with the required "copy of applicant's signed statement certifying that there [was] no current dispute at [that] time." *Id.*, Exh. D. Chemical did not honor the request. Neither Eaton & Van Winkle nor the Debtor attempted a subsequent drawing under the Second LOC.

### 2. Procedural History of the Case

An involuntary petition for relief under Chapter 7 was filed against the Debtor on November 1, 1994. Thereafter, in February 1995, the Debtor voluntarily converted the case to one under Chapter 11. The Committee was appointed on March 3, 1995 and Debtor agreed that the Committee could commence and prosecute the pending adversary proceeding against Chemical. Ultimately, the Debtor formerly assigned to the Committee all of its rights and causes of action in this adversary proceeding pursuant to Section 12.05 of the Second Amended Joint Plan of Liquidation of Sanders Langsam Tobacco Co., Inc., S & L East Distributors, Inc., and Sachs Cigars Co., Inc., confirmed by Order of this Court dated August 1, 1995.

The adversary proceeding itself was commenced on April 28, 1995, two days before the expiration date of the First and Second LOCs. The complaint alleges two causes of action against Chemical, namely, the wrongful dishonor of both the First and Second LOC. Chemical timely interposed an answer, denying the material allegations of the complaint and asserting the following four defenses: (1) failure to state a claim; (2) Chemical's good faith and commercially reasonable performance in observance of general bank-

ing usage; (3) that the drawings under the First and Second LOC were not in compliance with the terms of the LOCs; and (4) that the drawings under the First and Second LOC were not in compliance with the provisions of the UCP. Discovery thereafter ensued and the pending motions were made.

### DISCUSSION

### A. The Standards Governing Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure [6] states that a motion for summary judgment shall be granted

[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56. Accordingly, in ruling upon a summary judgment motion, the Court must determine whether a genuine issue of fact exists; it is not the Court's province at this stage of the proceeding to resolve disputed issues of fact if any are demonstrated to exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, the Court must draw all ambiguities and reasonable inferences in favor of the non-moving party. *Thornton v. Syracuse Savings Bank*, 961 F.2d 1042 (2d Cir.1992); *Levin v. Analysis & Technology, Inc.*, 960 F.2d 314 (2d Cir.1992).

The movant carries the initial burden of showing that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548; *Kurtzman v. Nat'l Union Fire Ins. Co.*, 147 B.R. 335, 338 (Bankr.S.D.N.Y.1992); *CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.)*, 145 B.R. 131, 135 (Bankr. S.D.N.Y.1992). The summary judgment motion should be granted only if (1) there is no

---

**6.** Rule 56 governs a motion for summary judgment in an adversary proceeding by virtue of

Rule 7056 of the Federal Rules of Bankruptcy Procedure.

genuine issue as to any material fact, and (2) the movant is entitled to judgment as a matter of law. Otherwise, it must be denied. *Anderson,* 477 U.S. at 247–52, 106 S.Ct. 2505; *Hamilton v. Smith,* 773 F.2d 461, 466 (2d Cir.1985).

When a motion for summary judgment is made and supported by the movant, Rule 56(e) requires the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[7] Fed.R.Civ.P. 56(e). The non-moving party may not defeat a properly supported motion by relying on self-serving and conclusory statements concerning the nature of the facts, and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., supra,* 475 U.S. at 586, 106 S.Ct. 1348. The non-movant must ultimately demonstrate that there is some evidence which would create a genuine issue of material fact.[8] *Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 177–78 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence.'" *Id.* (*quoting Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

 E.D.N.Y. LBR 7056–1 is almost identical to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts.[9] These rules require a moving party to set forth, with specificity, each material fact as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion. In turn, the non-moving party is required to set forth the "material facts as to which it is contended that there exists a genuine issue to be tried." Local Rule 3(g). All material facts included by the moving party in its statement are deemed admitted unless they are "directly contradicted" by an opposing statement. *Id.; National Union Fire Ins. Co. v. Antony,* No. 87 CIV. 1310, 1988 WL 49040, at *7 (S.D.N.Y. May 9, 1988); *see also Star–Kist Foods, Inc. v. Goldstein,* No. 87 CIV. 2377, 1988 WL 132844 at *4 (S.D.N.Y. Dec. 9, 1988) (papers opposing summary judgment motion must "isolate, focus and properly controvert the matters set forth" in a 3(g) statement).

 "Actions on letters of credit are 'well suited to determination by motion for summary judgment because they normally present solely legal issues relating to an exchange of documents.'" *Oei v. Citibank, N.A.,* 957 F.Supp. 492, 502 (S.D.N.Y.1997) (*quoting Banque Worms v. Banque Commerciale Privee,* 679 F.Supp. 1173, 1178 (S.D.N.Y.1988) *aff'd,* 849 F.2d 787 (2d Cir. 1988)); *see also Transamerica Delaval Inc. v. Citibank, N.A.,* 545 F.Supp. 200, 203 (S.D.N.Y.1982) (letter of credit disputes usually present legal issues relating to an exchange of documents rather than questions of fact). For this reason, the Court agrees with the parties that the issues are ripe for summary judgment.

### B. General Principles Governing Letters of Credit

 "A letter of credit ... 'is a common payment mechanism in international trade that permits the buyer in a transaction to substitute the financial integrity of a stable credit source (usually a bank) for his own.'"

---

7. Fed.R.Civ.P. 56(e) states:
 When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

8. Perfunctory statements, vague charges and conclusory allegations made in an opposition brief are not enough to defeat a motion for summary judgment. *Bank of China v. Chan,* No. 88 CIV. 0232 MBM, 1990 WL 53007 (S.D.N.Y. April 23, 1990), *rev'd in part on other grounds,* 937 F.2d 780 (2d Cir.1991); *Hysell v. Mercantile Stores Co.,* 736 F.Supp. 457 (S.D.N.Y.1989).

9. The source of this Local Civil Rule is former Local Civil Rule 3(g). At the time the parties submitted the instant motions, the applicable local rule regarding statements of undisputed facts was Rule 22(b) of the Local Rules of the United States Bankruptcy Court for the Eastern District of New York.

**8**

*Bouzo v. Citibank, N.A.*, 96 F.3d 51, 57 (2d. Cir.1996) (*quoting Alaska Textile Co. v. Chase Manhattan Bank*, 982 F.2d 813, 815 (2d Cir.1992)). The uniqueness of letters of credit are embodied in the UCP, "a compilation of internationally accepted commercial practices, first issued in 1930 by the International Chamber of Commerce and revised approximately every ten years since." *Alaska Textile, supra*, 982 F.2d at 816. Although not law, "the UCP applies to most letters of credit . . . because issuers generally incorporate it into their credits . . . and the New York Uniform Commercial Code expressly provides that 'it does not apply to a letter of credit or a credit if by its terms or by agreement, course of dealing or usage of trade such letter of credit or credit is subject in whole or in part to the [UCP].'" *Id.* at 816–17 (*quoting* N.Y.U.C.C. § 5–102(4) (McKinney's 1991)). Both the First and Second LOC specifically incorporate the provisions of the UCP, and thus it applies here.

> In a standard letter of credit transaction, the letter of credit is only one of three distinct relationships between three different parties: (1) the underlying contract for the purchase and sale of goods between the buyer ("account party") and the seller ("beneficiary"), with payment to be made through a letter of credit to be issued by the buyer's bank in favor of the seller; (2) the application agreement between the bank and the buyer, describing the terms the issuer must incorporate into the credit and establishing how the bank is to be reimbursed when it pays the seller under the letter of credit; and (3) the actual letter of credit which is the bank's irrevocable promise to pay the seller-beneficiary when the latter presents certain documents (*e.g.*, documents of title, transport and insurance documents, and commercial invoices) that conform with the terms of the credit. (citations omitted).

*Alaska Textile, supra*, 982 F.2d at 815; *see also Bouzo, supra*, 96 F.3d at 56; *Voest–Alpine Intern. Corp. v. Chase Manhattan Bank*, 707 F.2d 680, 682 (2d Cir.1983).

Additionally, and perhaps most significant to the controversy here, "the bank's payment obligation to the beneficiary is primary, direct and *completely independent* of any claims which may arise in the underlying sale of goods transaction." *Voest–Alpine*, 707 F.2d at 682 (emphasis added). "The bank's sole function is the financing; it is not concerned with or involved in the commercial transaction." *Marino Industries v. Chase Manhattan Bank, N.A.*, 686 F.2d 112, 115 (2d Cir.1982). As a consequence, banks can allow letters of credit to achieve great fluidity in financing transactions because the bank's limited role enables it to act quickly and decidedly. *Id.*

Nonetheless, the fluidity and absolute separateness from the underlying contract between the buyer and seller mandates that in letter of credit transactions, "'all parties concerned deal in documents, not in goods, services, and/or other performances to which the documents may relate.'" *Alaska Textile*, 982 F.2d at 816 (*quoting* UCP Art. 4). Since the parties to these transactions deal only in documents, "the terms and conditions of a letter of credit must be strictly adhered to. . . ." *Corporacion de Mercadeo Agricola v. Mellon Bank*, 608 F.2d 43, 47 (2d Cir.1979). " 'There is no room for documents which are almost the same, or which will do just as well.'" *Alaska Textile*, 982 F.2d at 816 (*quoting Equitable Trust Co. v. Dawson Partners*, [1927] Lloyd's List L.R. 49, 52 (1926)). As stated by the Second Circuit, in *Voest–Alpine:*

> Viewed in this light it becomes clear that the doctrine of strict compliance with the terms of the letter of credit functions to protect the bank which carries the absolute obligation to pay the beneficiary. Adherence to this rule ensures that banks, dealing only in documents, will be able to act quickly, enhancing the letter of credit's fluidity. Literal compliance with the credit therefore is also essential so as not to impose an obligation upon the bank that it did not undertake and so as not to jeopardize the bank's right to indemnity from its customer.

*Supra*, 707 F.2d at 682–83.

Equally important, the "corollary to the rule of strict compliance is that the requirements in letters of credit must be

explicit ... and that all ambiguities are construed against the bank." *Marino Industries, supra,* 686 F.2d at 115 (citation omitted). If the documents submitted appear on their face to comply with the documentary conditions contained in a letter of credit, the bank's obligation to pay is absolute regardless of facts surrounding the underlying buyer/seller transaction. *See Alaska Textile,* 982 F.2d at 816.

### C. The First LOC

The sole issue with respect to the First LOC is whether the Debtor submitted a "purchase order evidencing quantities and prices of merchandise in above invoices" as required by the fourth Documentary Condition.[10] Chemical contends that it properly rejected Debtor's drawings under the First LOC because the Debtor did not supply the required documents. The Committee disagrees, asserting that the Debtor complied with the documentary requirements of the First LOC and that the subsequent dishonor of the drawing by the bank was improper.

It is undisputed that the following documents were the only ones submitted to Chemical in connection with the fourth documentary requirement:

- The Purchase/Supply Agreement originally entered into between the Debtor and LIC;
- An affidavit from Levine (Debtor's vice president) setting forth the procedures used to fill open purchase orders;
- The July 16, 1992 letter from Sinew to the Debtor authorizing computer generated transmissions to serve as "authorized purchase orders;" and
- A document, dated April 15, 1994, which purportedly amends the July 16, 1992 letter (which is titled "Service Agreement for Cheap Johns/Wise Buys").

There is no dispute that Chemical received these documents, reviewed them, and determined that they did not comply with the First LOC's Documentary Conditions.

The Court believes that the actions taken by Chemical were appropriate under the circumstances. Under governing principles, Chemical was "not expected or required to be familiar with or to consider the customs of, or the special meaning or effect given to particular terms in, the trade." *Marino Industries,* 686 F.2d at 115. "[D]ocuments inconsistent on their face are not in accordance with the letter of credit requirements." *Oei, supra,* 957 F.Supp. at 504. Additionally, as stated by the New York Court of Appeals, the "rule [of strict compliance] finds justification in the bank's role in the transaction being ministerial ... and to require it to determine the substantiality of discrepancies would be inconsistent with its function." *United Commodities–Greece v. Fidelity Int'l Bank,* 64 N.Y.2d 449, 455, 489 N.Y.S.2d 31, 33, 478 N.E.2d 172 (1985) (citations omitted).

It is clear from a review of the documents submitted on behalf of the Debtor to Chemical that, on their face, they are not a "purchase order evidencing quantities and prices of merchandise in above invoices." The Committee acknowledges that the Debtor and Sinew "did not utilize individual purchase orders." The Debtor's vice president concedes in his affidavit that purchase orders are non-existent. *See* First Capasso Aff., Exh. I, at 4 para. 16 (where Levine states that "[w]ritten purchase orders do not exist except that the invoices evidence sales, and the attached receipted bills of lading acknowledge delivery of the items on the invoices"). Under these facts, there is clear support for Chemical's determination that the documents presented did not on their face include any purchase orders. In the context of summary judgment, there is no disputed issue of fact that arises with respect to this point.

What is perhaps most paradoxical in this case is that although the Debtor and Sinew apparently never utilized purchased orders, the First LOC was *amended by them* to include this documentary requirement. As originally drafted, the First LOC contained two documentary requirements, neither of

---

10. The other Documentary Conditions of the First LOC were apparently satisfied by the Debt-

or because they are not discussed anywhere in the motion papers.

which required the presentation of a purchase order. Then, for reasons known only to the parties and not divulged to Chemical or the Court, the First LOC was amended to include the requirement of a "purchase order evidencing quantities and prices of merchandise in above invoices." This amendment occurred on June 30, 1992, fifteen days after the issuance of the original letter of credit. Yet, within but a two week period, the parties are confirming—as between themselves—that they will operate in the absence of purchase orders. *See* Sinew's July 16, 1992 letter to the Debtor.

Why, within this conflux of events, the parties did not seek to amend the terms of the First LOC to reflect the actual manner within which they operate is an open question. Nonetheless, it is undisputed that no subsequent requests were made, by any party, to amend the First LOC so as to remove the documentary requirement that purchase orders be included when seeking payment under the First LOC. It is further undisputed that the First LOC was amended several times and there is no suggestion in the record that the parties were prohibited from dealing with this issue at any time during the course of making these other amendments.

Any issue of fact that might arise as to why the parties failed to amend the First LOC to delete a requirement voluntarily added by them is, however, neither material nor relevant to the matters presented by the pending motions for summary judgment. The only relevant facts are that the First LOC contained a requirement for the inclusion of purchase orders and that no purchase orders were enclosed by the Debtor or Eaton & Van Winkle when seeking payment under the First LOC. Simply put, the Court agrees with Chemical that the Debtor's drawing failed to comply with the terms and conditions of the First LOC and that Chemical was justified in refusing to honor the draft.

 Nevertheless, the Committee contends that the submitted documents, when considered as a whole, constitute the required purchase order. The Court disagrees. Chemical was not required to "scrutinize the collateral papers ... [n]or was it permitted to read into the instrument the contemplation or intention of the seller and buyer." *Courtaulds North America, Inc. v. North Carolina Nat'l Bank,* 528 F.2d 802, 806 (4th Cir.1975). The general rule is clear: "there is no room for documents which are almost the same, or which will do just as well." *Alaska Textile,* 982 F.2d at 816. To hold otherwise would go against the basic tenet of letter of credit law, namely, that banks are (and, for reasons of public policy, should be) "ignorant as to the specifics of the transaction" and must "decide quickly and reliably whether to pay by simply looking at the documents and determining whether they comply with the letter of credit's requirements, without the need to judge the significance of any discrepancies." *Oei, supra,* 957 F.Supp. at 503 (finding further that "[t]his standard applies to the issuer-beneficiary relationship [as is the case here], at least under New York law").

The Committee's reliance on *United States Steel Corp. v. Chase Manhattan Bank,* No. 83 CIV. 4966 WCC, 1984 WL 598 (S.D.N.Y. July 2, 1984) (*"U.S. Steel "*), is inopposite. In *U.S. Steel,* Chase refused to honor a draft because certain purchase orders contained the notation "verbal" where required purchase order numbers were supposed to be inscribed. The court, when addressing the standard employed in letter of credit cases, applied the strict compliance standard, *id.* at *1, but then concluded that an issue of material fact arose when general contract principles were applied to the letter of credit. *Id.* at *2. Even assuming *arguendo* that general principles of contract law apply to letters of credit, there is no ambiguity or vagueness found in the terms and conditions of the First LOC; nor are 'there multiple interpretations that arise from the provisions of the First LOC. Contrary to the Committee's urging, this is not a case where purchase orders were submitted according to the credit's requirements, but with ambiguous notations, as was the case in *U.S. Steel.* In the instant case, *no purchase orders* were submitted.

Moreover, as a general rule, "if terms of the letter of credit are ambiguous, that ambiguity is construed against the issuer, at least where ... the issuer drafted the letter." *3Com Corp. v. Banco de Brasil,* 2 F.Supp.2d

452, 459 (S.D.N.Y.1998). That, of course, is not what happened here since it was Sinew, and not Chemical, that drafted the amendment to the First LOC requiring the inclusion of purchase orders. *Cf. Bouzo, supra,* 96 F.3d at 57–58 (ambiguity is not construed against the issuer when the letter of credit is not drafted by the issuing bank); *see also* Affidavit of Anthony Capasso, sworn to November 16, 1995 (the "Second Capasso Aff."), Exh. D.

A review of the fourth documentary condition of the First LOC shows that it required the submission of a "purchase order evidencing quantities and prices of merchandise in above invoices." While a purchase order is capable of taking on different forms, Chemical was "not expected or required to be familiar with or consider the customs of, or the special meaning or effect given to particular terms in, the trade." *Marino Industries,* 686 F.2d at 115. Chemical was merely required to review the documents submitted and determine if they complied with the terms of the First LOC. This is especially true where, as here, the letter of credit was amended after issuance to include this *new* requirement. While the Debtor (and its creditors) are distressed over Chemical's failure to honor their requests for payment under the First LOC, there was a two year period within which the Debtor and Sinew were aware that they were not utilizing purchase orders and yet they failed to amend the First LOC to reflect their practice. There is nothing in law or in fact that gives rise to an inference that Chemical knew or should have known of the parties' practice or that Chemical should have ignored the plain words of the fourth Documentary Condition and accepted the substitute documents. For these reasons, the Court believes that Chemical was justified, as a matter of law, in refusing to honor the draft requested under the First LOC.

■■■ Alternatively, the Committee contends that the July 16, 1992 letter should be considered a waiver of the purchase order requirement. While waivers are recognized in letters of credit transactions, *see generally Oei, supra,* 957 F.Supp. at 509; *Voest–Alpine, supra,* 707 F.2d at 684, the "issue of waiver normally arises when a bank pays on non-conforming documents and seeks reimbursement from its customers." *Cooperative Agricole Groupement De Producteurs Bovins De L'Ouest v. Banesto Banking Corp.,* No. 86 CIV. 8921 PKL, 1989 WL 82454, *23 (S.D.N.Y. July 19, 1989). For this reason, claims "by a beneficiary of a letter of credit that a bank has waived strict compliance with the terms of the credit should generally be viewed with a somewhat wary eye." *Voest–Alpine,* 707 F.2d at 685.

In New York, the well known and oft-stated definition of waiver is the "intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." *United Commodities–Greece,* 64 N.Y.2d at 457, 489 N.Y.S.2d at 34, 478 N.E.2d 172; *see also Voest–Alpine, supra,* 707 F.2d at 685; *Internat'l Leather Distrib. v. Chase Manhattan Bank,* 464 F.Supp. 1197, 1201 (S.D.N.Y.1979), *aff'd,* 607 F.2d 996 (2d Cir.1979). Here, in an attempt to demonstrate a waiver, the Committee points to the July 16, 1992 letter from Sinew to the Debtor. That letter refers to the First LOC and, at least on its face, sets forth what appears to be the authorized procedures for placing purchase orders as between the two parties. What the Committee fails to recognize, however, but which Chemical points out, is that the applicability of this letter is quite limited. The letter is from Sinew and addressed to the Debtor. Chemical was never a party to this communication or the negotiations concerning its terms. The letter was never sent to Chemical except when the Debtor sought payment under the LOC. It does not refer to the First LOC in any respect and does not purport to be an amendment to it. In brief, however loosely construed, it does not represent an "intentional relinquishment of a known right" by the parties.

■■■ In financial transactions such as the one here, there are three separate, distinct and independent relationships: (i) between the seller and the buyer; (ii) between the buyer and the bank; and (iii) between the bank and the seller. *See, e.g., Alaska Textile, supra,* 982 F.2d at 815. An agreement between two parties does not automatically translate into an agreement among all three.

Chemical was never a party to any waiver, if in fact there was one, and never consented to one. As stated in *Banesto, supra,* "as a general rule, the agreement of the applicant and beneficiary cannot alter the terms of the credit *without the consent of the issuer.*" *Id.* at *23 (emphasis added).

In addition, Article 10(d) of the UCP provides that an irrevocable letter of credit "can neither be amended or canceled without the agreement of the issuing bank . . . and the beneficiary. Partial acceptance of amendments contained in one and the same advice of amendments is not effective without the agreement of all above named parties." As Judge Leisure explained in *Banesto,* a letter of credit

> constitutes a contract between [the issuer] and [the beneficiary]. Only [the issuer] can waive its right to strict compliance with the terms of the letter of credit . . . . Any waiver by the applicant merely effects the contract between the bank and the applicant. Any other interpretation of the waiver doctrine would emasculate the UCP requirements for amending a letter of credit.

*Id.* at *23. As Chemical never consented to a waiver of the fourth documentary condition contained in the First LOC, the Debtor's failure to strictly comply with the requirement justified Chemical's refusal to honor the drawing.

The Committee's reliance on *International Leather* is misplaced. In *International Leather,* the dispute concerned an alleged wrongful *honor* of a letter of credit, not an alleged wrongful *dishonor.* The dispute was between the applicant and the bank, not the bank and the beneficiary as is the case here. Additionally, the court in *International Leather* found that the applicant expressly authorized the bank to make payment under the letter of credit with full knowledge that the requisite documents had not been received. *Supra,* 464 F.Supp. at 1202. This simply is not the case here. While it may be debatable whether Sinew waived the purchase order requirement as between Sinew and the Debtor, there is absolutely no evidence in the record demonstrating that Chemical ever consented to such an agreement, let alone was aware of such an agreement prior to Debtor's attempt to draw under the First LOC. Accordingly, the Court finds that no such waiver existed as between Chemical and the Debtor.

Finally, the Committee asserts that Chemical's dishonor of the First LOC (as well as the Second LOC) was motivated by concerns over reimbursement. It alleges that Chemical was well aware of Cheap John's ominous financial condition at the time of the drawing under the LOCs. In support of its contention, the Committee points to various internal memos from Chemical to demonstrate its knowledge of Cheap John's dire financial state. For its part, Chemical denies that it was motivated by any improper motive and attempts to explain the internal memos and quell any alleged inaccurate assumptions. *See, e.g.,* Second Capasso Aff. While these conflicting accounts may ordinarily give rise to questions of fact, precluding the grant of summary judgment, this is not the case here because any disputed facts that arise from the internal memos or in any way relate to Chemical's motivation are not pertinent to the issues at hand.

More specifically, Chemical's good faith (or lack thereof) and motivation are not relevant. That a "bank's action in dishonoring a draft for non-conforming documentation is or may have been motivated by a desire to protect against its own imprudence in failing to obtain adequate security from its customer does not bar the bank from insisting on conforming documents." *Mellon Bank, supra,* 464 F.Supp. at 93. The Second Circuit, in affirming the district court's holding in *Mellon Bank,* further held that a bank's

> good faith is not a relevant issue on this record. The contract among the parties required that [the bank] pay on the letter of credit only after [the beneficiary] presented conforming documents. [The beneficiary] never presented conforming documents. Accordingly, [the bank] was never obligated to pay on the draft and the question of good faith does not arise.

*Mellon Bank,* 608 F.2d at 49. As the Debtor never presented the required "purchase order evidencing quantities and prices of mer-

chandise in above invoices," its drawing was deficient and Chemical was justified in refusing to honor the draft.

In sum, the Committee's cross-motion is denied with respect to the First LOC, and as there are no genuine issues of material fact, the Court grants summary judgment in favor of Chemical.

### D. The Second LOC

 Chemical argues that the Debtor's attempt to draw under the Second LOC was deficient because it failed to produce "a copy of applicant's signed statement certifying that there is no current dispute at this time." It is undisputed that this document was not submitted by the Debtor when attempting to draw under the Second LOC. The Committee urges, however, that Chemical "had independent knowledge that no dispute existed and should have honored the demand." *See* Committee's Consolidated Opposition, ¶ 7. While the Committee concedes that it cannot seek summary judgment with respect to the Second LOC, it urges that Chemical's "independent knowledge," together with the Debtor's failure to obtain the required statement "due to events beyond its control," demonstrates the existence of factual issues mandating the denial of Chemical's motion. *See* Committee's Consolidated Opposition, at 4 n. 2.[11]

The Court disagrees. The Committee admits that the Debtor did not submit the required documents when attempting to draw under the Second LOC. Consequently, no genuine issue of material fact exists with respect to the Second LOC and summary judgment should be granted in favor of Chemical. The same guidelines applicable to the First LOC are relevant here. " '[A]ll parties deal in documents, not in goods, services, and/or other performances to which the documents may relate.' " *Alaska Textile*, 982 F.2d at 816 (*quoting* UCP Art. 4). Because letter of credit transactions deal only in documents, "the terms and conditions of a letter of credit must be strictly adhered to . . . ." *Mellon Bank, supra*, 608 F.2d at 47.

" 'There is no room for documents which are almost the same, or which will do just as well.' " *Alaska Textile*, 982 F.2d at 816 (*quoting Equitable Trust Co. v. Dawson Partners*, [1927] Lloyd's List L.R. 49, 52 (1926)). The failure of the Debtor to present the document required by the Second LOC is a sufficient basis upon which Chemical could properly refuse to honor the draft.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (E), and venue is proper. This is a core proceeding arising under Title 11.

2. The motion for summary judgment by Chemical with respect to the first cause of action contained in the complaint is granted, and the cross-motion for summary judgment by the Committee is denied.

3. The motion for summary judgment by Chemical with respect to the second cause of action contained in the complaint is granted.

Defendant is directed to settle an Order and Judgment consistent with this Decision.

---

11. The Committee's entire argument concerning the dishonor of the Second LOC is contained in paragraph 7 and footnote 2 of the Committee's Consolidated Opposition. No evidentiary support is provided whatsoever. Standing alone, the Committee's conclusory allegations are insufficient to defeat a motion for summary judgment. *See* note 8, *supra*.